IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB, ) | |
| ) | Civil Action No._____ |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MICHAEL O. LEAVITT ) | |
| Administrator, ) | |
| United States Environmental Protection ) | |
| Agency, ) | |
| ) | |
| Defendant. ) | |

**APPLICATION BY PLAINTIFF SIERRA CLUB FOR PRELIMINARY AND PERMANENT INJUNCTION**

Pursuant to Rule 65, Federal Rules of Civil Procedure, and LCvR 65.1, Plaintiff Sierra Club ("the Club") hereby asks the Court to enter a Preliminary Injunction directing the Administrator of the United States Environmental Protection Agency ("the Administrator" or "EPA") to complete and publish, within 45 days of the Court's order and consistent with the Clean Air Act, EPA's final approval and disapproval action on the state implementation plan submittals for the Washington area identified in Plaintiffs' Complaint. Sierra Club further requests that the Court schedule oral argument on this application within 20 days, as provided in LCvR 65.1(d). Expedited treatment of this matter is warranted because, as further explained below, this suit seeks action to remedy ozone pollution (smog) that presents an imminent and substantial health threat to hundreds of thousands of people in metropolitan Washington. The EPA delays complained of herein flout explicit statutory deadlines for the protection of public health: deadlines that expired years ago. The case does not

require presentation of witnesses and can be resolved based on the law and undisputed facts.  A hearing on the application should therefore require no more than an hour of the Court's time.

Sierra Club further asks the Court to advance and consolidate the hearing on the merits of Sierra Club's claims with the hearing on the application for preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(a)(2).  The law and facts underlying the request for preliminary relief are identical to those underlying the claim on the merits, and the case does not raise any complex issues requiring separate consideration of preliminary and permanent relief.  Advancement and consolidation is also justified by the urgency of the health threat from ozone pollution in the Washington area, as further described below.

## MEMORANDUM OF POINTS AND AUTHORITIES

**Introduction**

In this application, Sierra Club asks the Court to order EPA to take actions explicitly mandated by the Clean Air Act to protect public health from ozone pollution in metropolitan Washington.  Specifically the Club asks the Court to order EPA to take final approval/disapproval action on ozone control plans submitted by Maryland, Virginia, and the District of Columbia ("states") for the Washington area.  Disapproval of such plans would trigger requirements for the adoption of new, stronger clean air plans to reduce ozone pollution, and would start 18 and 24-month clocks for the imposition of sanctions if the states fail to remedy plan defects.  As further discussed below, EPA's failure to take these actions violates express deadlines in the Act, and threatens the health of the 3.9 million people living in the Washington area.

By letter postmarked September 16, 2004, Sierra Club provided notice to EPA, pursuant to § 304(b)(2) of the Act, of the Club's intent to sue the Administrator to enforce the nondiscretionary duties described herein.  Exhibit ("Exh.") 1.  More than 60 days have passed

since service of that letter, and EPA has still not performed the relevant duties.  Accordingly, this Court has jurisdiction to order EPA to act, pursuant to § 304(a)(2) of the Act, 42 U.S.C. § 7604(a)(2).   That section authorizes citizen suits in the district courts, after 60 days' prior notice to EPA, to compel performance by the Administrator of nondiscretionary duties under the Act. Id. § 7604(a).  Sierra Club has standing to sue because, among other things, it has members living in the Washington area whose health and welfare are adversely affected by unhealthful ozone pollution levels in their community.  Exhs. 2-5.  As further described below, EPA's failure to act as complained of herein prolongs the exposure of Club members to such unhealthful pollution, illegally waives requirements of the Act designed to protect them from such pollution, and deprives them of health, welfare and procedural protections guaranteed under the Act.

   A.   **Statutory and Regulatory Background**

The metropolitan area of Washington, D.C., has violated federal health standards for ground-level ozone for more than 20 years. 40 C.F.R. §§ 81.309, .321, .347 (2004 & prior versions).   Ozone, a principal component of urban smog, is a severe lung irritant even to healthy adults. 66 Fed. Reg. 5002, 5012/3 (2001).   It can cause shortness of breath, chest pains, increased risk of infection, aggravation of asthma, and significant decreases in lung function.  Id. Elevated ozone levels have been linked to increased hospital admissions and emergency room visits for respiratory causes.  65 Fed. Reg. 6698, 6707/1 (2000).  Ozone presents a special health risk to small children, the elderly, persons with lung ailments, and adults who are active outdoors. Id.   Populations particularly at risk from ozone in the Washington area include:

   * 736,400 children under the age of 13

   * 225,700 asthmatics, including 53,200 children with asthma

   * 210,000 residents with other chronic or persistent respiratory diseases, such as chronic

    bronchitis and emphysema

  * 336,000 residents over the age of 65; and

  * 185,000 – 370,000 otherwise healthy individuals who are especially sensitive to ozone;
Exh. 6.

    Ozone is formed in the atmosphere when oxides of nitrogen ("NOx") and volatile organic compounds ("VOCs") are emitted into the air in the presence of sunlight.  H.R. Rep. No. 101-490, pt.1 at 202 (1990) ("House Report").   Major sources of ozone forming emissions include industrial facilities, power plants, and motor vehicles. Id. at 202-03.

    The 1970 Clean Air Act, as amended in 1977 and 1990, was enacted specifically to attack the kinds of health threats presented by ozone pollution.  Pursuant to the Act, the United States Environmental Protection Agency ("EPA") has adopted National Ambient Air Quality Standards ("NAAQS") for ozone and other contaminants as pollution limits necessary to protect public health and welfare. 42 U.S.C. § 7409; 40 C.F.R. Part 50.   EPA designates communities as "attainment" or "nonattainment" areas based on whether they meet the standards for a particular pollutant.  42 U.S.C. § 7407(d).  Ozone nonattainment areas are further classified as marginal, moderate, serious, severe or extreme, depending on the severity and persistence of the ozone problem.  Id. § 7511(a), (b)(2).

    For each nonattainment area, states must submit to EPA a state implementation plan ("SIP" or "plan") meeting detailed requirements set forth in the Act.  Among other things, this SIP must provide for attainment of the standards "as expeditiously as practicable," but no later than specific deadlines set forth in the Act.  42 U.S.C. §§ 7410 , 7502,  7511.  If an ozone nonattainment area fails to meet its attainment deadline, it must be reclassified ("bumped up") to a higher classification.

Id. § 7511(b)(2). Areas with higher classifications are given more time to attain the standard, but must implement stronger anti-pollution measures specified in the Act. Id. §§ 7511(a)(1), 7511a.

In addition to demonstrating timely attainment, all nonattainment area plans must provide for implementation of all "reasonably available control measures [RACM] as expeditiously as practicable." Id. § 7502(c)(1). Plans for serious and above nonattainment areas must also include "rate of progress" (ROP) plans with control measures adequate to ensure 3% annual reductions in ozone forming emissions, averaged over each three year period after 1996 until the attainment date. 42 U.S.C. § 7511a(c)(2)(B). The Act further specifies pollution control requirements for new and expanded industrial plants (referred to as "new source review") – requirements that become increasingly stringent in areas with higher ozone classifications. Id. §§ 7503, 7511a. Implementation plans must further include "contingency" measures that will kick in automatically if the plan fails to produce required annual reductions or timely attainment. Id. §§ 7502(c)(9), 7511a(c)(9).

The Act further sets forth mandatory deadlines for EPA action on implementation plans and plan revisions submitted by states. Pursuant to §§ 110(k)(1) & (2) of the Act, 42 U.S.C.§ 7410(k)(1) & (2), EPA must take final action on such plans and revisions within a maximum of 18 months after submittal by the state. Such action must consist of one of the following actions on such submittal (hereinafter, collectively referred to as "approval/ disapproval actions"): approve as a whole; disapprove as a whole; or approve in part and disapprove in part . 42 U.S.C. § 7410(k)(2) & (3). Disapproval of a plan, in whole or in part, triggers clocks for the imposition of sanctions and for adoption of federally imposed clean air measures, as well as restrictions on the addition of new road projects to regional transportation plans. Id. §§ 7410(c), 7509(a) & (b);

40 C.F.R. § 93.120(a) (2001).  States can avoid sanctions by correcting their plan deficiencies before the sanction clocks run out.  42 U.S.C. § 7509(a).

### B. The Washington ozone SIP

Pursuant to the 1990 Amendments to the Act, the Washington metropolitan area was initially classified, effective November 15, 1990, as a "serious" ozone nonattainment area, with an outside attainment deadline of November 15, 1999.  40 C.F.R. §§ 81.309, .321, .347 (2004).  The nonattainment area (herein, "Washington area") includes: the District of Columbia; Montgomery, Prince Georges, Charles, Calvert and Frederick counties in Maryland;  and Fairfax, Arlington, Loudon, Prince William and Stafford counties in Virginia (as well as cities within the same region, such as Alexandria and Fairfax).  Id.  The Act required the District of Columbia, Maryland and Virginia to submit the above-described plan provisions for the Washington area, including the attainment and rate-of-progress demonstrations, not later than November 15, 1994.  42 U.S.C. § 7511a(b)(1)(A).

Neither the states nor EPA followed this legally mandated path.  The states did not submit the rate of progress ("ROP") plans (referred to by EPA as the "Phase I" plans) until November and December of 1997, and did not submit attainment and other plan provisions (referred to by EPA as the "Phase II" plans) until April 1998.  66 Fed. Reg. 586 (2001).  Exh. 7.  As finally submitted, the plans (jointly prepared by the states through the Metropolitan Washington Council of Governments) did not provide for attainment of the ozone standard by the statutory attainment deadline of November 15, 1999.  Sierra Club v. EPA, 294 F.3d 155, 159 (D.C. Cir. 2002).  Instead, the states asked EPA to extend the attainment deadline by six years, to November 15, 2005, but without reclassifying the area to "severe" – the only path provided by the Act for extending the attainment date.  Id.  The plans also did not provide for 3% annual

reductions in emissions after 1999 as required by the Act's ROP provisions, did not provide for additional "reasonably available" control measures ("RACM"), and did not contain the contingency measures mandated by the Act. Id. at 159, 164.

The November 15, 1999 attainment deadline for the Washington area came and went with the area still violating the ozone standard and still lacking approved attainment or progress plans. EPA did not publish a notice by May 15, 2000 as required by the Act announcing that the area had missed the attainment deadline and reclassifying the area to severe. Instead, on January 3, 2001, EPA published a Federal Register notice granting the states' request to extend the attainment date to 2005, without reclassifying the area to severe. 66 Fed. Reg. 586 (2001). In the same notice, EPA fully approved the states' ROP ("Phase I") and attainment ("Phase II") plans for the Washington area. EPA took these actions despite strenuous objections by Sierra Club and others that EPA had no authority to extend the attainment date without reclassifying the area to severe, that the states' plans failed to assure the legally required 3% annual reductions in pollutant emissions after 1999, failed to provide for adoption of all reasonably available control measures as mandated by the Act, and failed to include contingency measures as required by the Act. Id. 66 Fed. Reg. 591-603, 607-13, 615-16. EPA brushed aside all of these objections. Id.

Sierra Club filed a timely petition for review in the D.C. Circuit challenging EPA's extension of the attainment date and approval of the states' Phase I and II plans. On July 2, 2002, the D.C. Circuit granted the petition, holding that EPA acted illegally in extending the ozone attainment date for the Washington area, and in approving the plans. Sierra Club v. EPA, 294 F.3d 155 (D.C. Cir. 2002)("Sierra Club I"). The Court held that EPA could not extend the attainment date without reclassifying the area to severe. Id. at 160-62. It further agreed with Sierra Club that: 1) the Phase I (ROP) plans were deficient because they failed to provide for

7

annual 3% emission reductions after 1999; 2) the attainment plans were deficient because the states had failed to adequately consider additional RACMs; and 3) both the ROP and the attainment plans were deficient because they lacked contingency measures as required by the Act. Id. 163-64. The Court vacated EPA's approval of the plans, and remanded the matter to EPA. Id. 164.

When EPA failed to take action on remand, Sierra Club filed a citizen suit in this Court on November 11, 2002, asking for a preliminary and permanent injunction setting deadlines for EPA to: a) determine whether the Washington area attained by the applicable attainment date, and announcing the appropriate reclassification of the area if the area had not timely attained (nonattainment/reclassification determination); and b) take final approval/disapproval action on the previously submitted ozone plans for the area. Sierra Club v. Whitman, No. 02-CV-2235 (JR). On December 18, 2002, this Court granted Sierra Club's request, ordering EPA to make a nonattainment/reclassification determination by January 27, 2003, and to take approval/disapproval action on the plans by April 17, 2003.[1] Exhs. 8, 11. In response, EPA on January 24, 2003 published a formal finding that the Washington area had failed to attain the ozone standard by the "serious" area attainment date, and announced reclassification of the area to "severe". 68 Fed. Reg. 3410 (2003).

On April 17, 2003, EPA took final action conditionally approving the previously submitted ozone plans for the Washington area, even though the states had not corrected any of

---

[1] The Court's order specifically directed EPA to take approval/disapproval action on the plan submittals listed at 66 Fed. Reg. 568 (Jan. 3, 2001). Exh. 8 at 2. Plaintiffs seek an order here directing EPA to take final approval/disapproval action on the same plan submittals, which are listed on Exhibit 7 appended hereto.

8

the deficiencies previously identified by the D.C. Circuit.  68 Fed. Reg. 19106 (2003).  EPA stated that it could conditionally approve these plans because the states had made commitments to correct the deficiencies within one year. Id. at 19106-08.  EPA further announced that it was conditionally approving these plans as meeting the requirements for "severe" areas, even though the plans contained none of the more stringent programs required by the Act for severe area.  Id.  Again, EPA stated that it could grant such conditional approval because the states had committed to supply the missing severe area programs within one year. Id.  EPA took these actions over strenuous objections by Sierra Club that the Act and D.C. Circuit precedent clearly prohibited conditional approval of such deficient plans.

Sierra Club timely petitioned the D.C. Circuit for review of EPA's April 17, 2003 conditional approval action.  The Club argued that the conditional approval was illegal because the states had failed to submit any substantive provisions at all to correct the deficiencies previously identified by the D.C. Circuit (e.g., lack of RACM demonstration, post 1999 progress plans, and contingency measures) or to adopt the additional measures required for "severe" areas.  The D.C. Circuit agreed, holding that EPA's action illegally allowed the states to delay adoption of pollution controls required by the Act.  Sierra Club v. EPA, 356 F.3d 296, 303 (D.C. Cir. 2004)("Sierra Club II")(EPA could not conditionally approve plans based "on nothing more than the States' promise to do next year what the Clean Air Act requires them to have already done").  The court vacated EPA's conditional approval action and remanded to the agency.  Id. 310.

The D.C. Circuit issued its opinion Sierra Club II on February 3, 2004, and its mandate on April 30, 2004 (Exh. 9), but EPA has yet to take final action on the plans for which its conditional approval was vacated by that decision.  Thus, years after the statutory deadlines for

9

EPA approval/disapproval action on these plans, EPA's duty to take such action remains unfulfilled.

On July 14, 2004, Sierra Club filed a motion asking this Court to enforce its original December 18, 2002 injunction in <u>Sierra Club v. Whitman</u> that directed EPA to publish final approval/disapproval action on the Washington area SIPs by April 17, 2003.  The Court denied the motion, holding that because EPA had published a final action by April 17, 2003, the agency had discharged its obligation under that particular injunction – which required only that EPA "publish" a final action by April 17, 2003.  Exh. 10.  The Court did not preclude the filing of a new lawsuit by Sierra Club seeking a new injunction enforcing EPA's still-unfulfilled statutory duty to take final approval/disapproval on the Washington area SIPs.

Sierra Club now seeks such a new injunction in the instant lawsuit. By illegally and repeatedly approving deficient state plans, EPA has eviscerated the precise timetables set by Congress for cleaning up dirty air in the Washington area.  We are now a *decade* past the statutory deadlines for submission of adequate SIPs, and the Washington area *still* lacks approved plans for remedying violations of the national health standards.  Meanwhile, the Washington area continues to experience unhealthful ozone levels, with repeated smog alert days when children are warned to limit outdoor play and senior citizens are warned to stay indoors.  See, e.g., http://www.mwcog.org/environment/air/downloads/ozone_calendar_04.pdf, http://www.mwcog.org/environment/air/downloads/calendar_2003.pdf, http://www.mwcog.org/pdf/calendar_2002.pdf.

Plaintiff Sierra Club has more than 17,000 members in the Washington area whose health and welfare are threatened by unhealthful ozone levels in their community.  Exhs. 2-5.  The Club contends that the EPA delays at issue here violate requirements of the Act designed to protect Club

10

members from such pollution, and deprives them of health, welfare and procedural protections guaranteed under the Act.  Among other things, Sierra Club contends that if EPA were required to take final approval/disapproval action on the states' plans, the agency would have no choice but to disapprove the plans because the D.C. Circuit has specifically ruled – *twice* now - that the plans do not meet all the requirements of the Act.  By delaying these actions, EPA is therefore delaying the stronger pollution controls, sanctions, and other measures specified in the Act to promote cleaner air in areas that fail to timely attain and fail to adopt adequate plans.  Sierra Club accordingly asks this Court to order EPA to take final approval/disapproval action on the states' ozone plans for the Washington area within 45 days.

    **C.**    **Argument**

    **1.**    **EPA has failed to perform its mandatory duty to take final approval/ disapproval action on the implementation plans for the Washington area**

EPA is in flagrant violation of its nondiscretionary duty to take timely approval/disapproval action on ozone SIPs previously submitted by the states. These SIPs included ROP (Phase I) plans submitted by the states in November and December of 1997 (and amended in 1999), attainment (Phase II) plans  submitted in April 1998 (and amended/supplemented in 1998 and 2000), and plan revisions seeking extension of the attainment date submitted in July and September 1999. 66 Fed. Reg. at 586.  Exh. 7.  As noted above, the Act requires EPA to take final approval/disapproval action on SIP submittals no later than 18 months after submittal, at the absolute outside.  42 U.S.C. § 7410(k)(1), (2).  See also 64 Fed. Reg. 70460, 70462 (1999)( "Under the CAA, EPA is required to approve or disapprove a State's submission no later than 18 months following submission"); NRDC v. EPA, 22 F.3d 1125, 1131, 1134, 1136 n.13 (D.C. Cir. 1994)(EPA has 14-18 months after plan submittal deadline to act on the submittal).  The SIPs at issue here were submitted six to seven

*years* ago.  This Court found that EPA action on these submittals was already overdue two years ago, when it ordered EPA to take final approval/disapproval action on the plans by April 17, 2003. Indeed, the Court at that time found that EPA "has a ministerial duty to approve or disapprove these" plans.  Exhibit 11 at 35. [2]

EPA's unlawful conditional approval of the ROP and attainment plans on April 17, 2003 did not discharge the agency's statutory approval/disapproval duty because that action has been vacated by the D.C. Circuit.  Sierra Club II, 356 F.3d at 310 ("we vacate and remand EPA's conditional approval action").   A vacated agency action is a nullity that has no force and effect.  Alabama Power Co. v. EPA, 40 F.3d 450, 456 (D.C. Cir. 1994)(to vacate means to annul, render void, defeat, and deprive of force).  Once vacated, an action loses the ability to "spawn[] any legal consequences" United States v. Munsignwear, 340 U.S. 36, 41 (1950).  See also Kelso v. United States Dep't of State, 13 F. Supp. 2d 12, 17-18, 24 (D.D.C. 1998)(CKK)(vacatur deprives agency action of any validity). Vacatur of the rules returned the situation to the *status quo ante* before the rules took effect, thereby leaving EPA's rulemaking duty unfulfilled.  Independent U.S. Tanker Owners

---

[2] The Court stated that the "only wrinkle" would be if EPA could demonstrate that reclassification of the Washington area to severe would make some of the plan provisions inoperative or materially changed.  Exh. 11 at 35-36.  The Court gave EPA 45 days to identify any such provisions (id. at 33-34), but EPA did not even attempt to do so – nor could it. Congress expressly stated that the requirements for the successive ozone classifications were meant to be "*cumulative*, in that each classification has to implement all the controls imposed on less polluted areas *in addition to* the controls specified for its class." House Report at 166 (1990)(emphasis added).  Thus reclassification of an area to a more polluted classification by definition cannot negate plan requirements for the previous classification.  In any event, Sierra Club respectfully submits that EPA's statutory duty to take timely approval/disapproval action on submitted plans is absolute, and unqualified.  42 U.S.C. § 7410(k)(1),(2).  Determination of whether the plans meet applicable requirements of the Act given the area's existing classification go to the *substance* of EPA's approval/disapproval decision, not to whether the agency must take approval/disapproval action in the first place.

Comm. v. Dole, 809 F.2d 847, 854-55 (D.C. Cir. 1987)(upon vacatur of rule by D.C. Circuit, conditions are "returned to the *status quo ante*, before the …rule took effect").

This Court very recently confirmed that vacatur of an EPA rule under the Clean Air Act returns the situation to the *status quo ante* before the rule was adopted. Environmental Defense v. Leavitt, 329 F. Supp. 2d 55, 64 (D.D.C. 2004). At issue was EPA's nondiscretionary duty to promulgate rules requiring factories to install best available retrofit technology ("BART") to limit emissions that contribute to haze in national parks. EPA had adopted such rules in 1999, but the D.C. Circuit vacated them in 2001. When EPA failed to adopt replacement rules after the vacatur, an environmental group filed suit in this Court to compel EPA performance of its nondiscretionary rulemaking duty. The Court held that the D.C. Circuit's vacatur of the 1999 rules returned conditions to the pre-1999 state of affairs, in which EPA had failed to promulgate the required rules:

> When a court vacates an agency's rules, the *vacatur restores the status quo before the invalid rule took effect* …[T]herefore, the [circuit] court's vacatur of EPA's promulgations relating to the BART Requirement *restored the status quo before EPA promulgated those regulations. That status quo presented a situation wherein EPA had failed to promulgate regulations* in accordance with the express deadline in § 7492(e)(1), despite its nondiscretionary statutory obligation to do so.

Id. at 64 (emphasis added). Thus vacatur of an EPA rule by the Court of Appeals puts EPA in the same position as if it had never promulgated the rule in the first place. In the current case, that means EPA must now be treated as though it never took the final approval/disapproval action mandated by § 110(k)(2) & (3) of the Clean Air Act.

Sierra Club is informed that, after the D.C. Circuit issued its opinion rejecting EPA's conditional approval of the states' plans, the states sent letters to EPA purporting to "withdraw" some of the plan submittals at issue in this case, with the withdrawals to be effective as of the

date of the D.C. Circuit's mandate.  This rather transparent attempt to evade disapproval of the plans does not, in fact, relieve EPA of its statutory duty to act on the plans.  As discussed above, once plans or plan revision are submitted to EPA, the agency has a mandatory duty to approve or disapprove them within 18 months. The Act contains no provision whatsoever for stopping that clock once triggered.  Moreover, to read such a provision into the statute would allow states to eviscerate the Act's deadline and sanctions provisions by repeatedly submitting deficient plans and then withdrawing them on the eve of EPA disapproval.

The states have also made SIP submittals subsequent to those at issue here.  For the same reasons discussed above, however, those submittals do not restart the 18-month clock for EPA action on the previously submitted plans at issue in this case.  The states are certainly free to submit additional plans, and indeed the Act sometimes requires them to do so, but the Act does not give states the power to stop the statutory clocks for EPA action on plans that have already been submitted.

**2. An injunction is necessary to effectuate the Act and protect public health**

If the purpose of legislation is thwarted by failure to comply, and the legislation specifically authorizes injunctive relief, then an injunction must issue. <u>United States v. Microsoft</u>, 147 F.3d 935, 943-44 (D.C. Cir. 1998). "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the courts to enforce them when enforcement is sought.  Courts of equity cannot, in their discretion, reject the balance that Congress has struck in a statute."  <u>United States v. Oakland Cannabis Buyers' Coop.</u>, 532 U.S. 483, 497 (2001).  Here, Congress unquestionably commanded EPA to take final action on these plans years ago.

Further, the Administrator's failure to act clearly thwarts the statutory purpose.  Congress laid out a precise schedule for implementation of the Clean Air Act and mandatory remedies for

delays to ensure that public health would be protected.  Initially, EPA must determine within 6 months of a SIP submittal deadline whether a complete SIP submittal has been made.  42 U.S.C. § 7410(k)(1)(B), (C).  If EPA finds the submittal complete, the agency has 12 months to approve or disapprove it (in whole or in part).  Id. § 7410(k)(2)-(4).   If EPA finds that a State has failed to make a complete, required submittal or disapproves a submittal,  the Act directs EPA to "promulgate a Federal implementation plan [FIP]…within two years." Id. § 7410(c)(1)(A)-(B).  A FIP must include whatever is needed "to fill…a gap" or "otherwise correct … an inadequacy in a State implementation plan." Id. § 7602(y). The Act allows EPA to avoid promulgation of the FIP only if "the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan." Id.. § 7410(c)(1).

In addition, a clock for imposition of sanctions must commence if EPA finds that a state has failed to timely submit a required SIP element, or if EPA disapproves a submission for failure to meet one or more of the Act's requirements.  Id. § 7509(a)(1)-(2)(emphasis added).  Once the sanction clock starts, the State has an initial 18-month grace period to correct the deficiency in its SIP before the first sanction (a requirement for increased emissions offsets) takes effect, and another 6 months to correct the deficiency before the second sanction (a highway funding restriction) takes effect. Id.  This statutory scheme was carefully crafted to provide strong incentives for States to develop timely complete SIPs that meet *all* of the statutory requirements, and to provide for the expeditious promulgation by EPA of any of the required measures that a State fails to timely adopt.  NRDC, 22 F.3d at 1131.

By repeatedly delaying and evading disapproval of the deficient SIPs for the Washington area, EPA has unlawfully nullified these express statutory remedies.  Had EPA disapproved

these submissions, as the Act required, the clocks for imposition of sanctions would have commenced, creating the incentive Congress intended for the states to correct the deficiencies in an expeditious manner.  Likewise, disapproval would have started the clock for adoption of corrective federal measures, providing assurance that –one way or the other – adequate pollution controls would be in place within 2 years.  Instead, through years of repeated, unlawful delays, EPA has prevented these clocks from even starting.  As a result, the Agency has ensured that, despite the lack of approved SIPs for the Washington area, sanctions and federal plans will not be required – at the earliest - until long *after* the 2005 outside attainment deadline. For all these reasons, EPA's conduct has unlawfully eviscerated the "statutory teeth" that Congress included in the Act "to enforce the new SIP deadlines."  NRDC, 22 F.3d at 1131.

Moreover, both the plaintiff's members and the public are irreparably harmed by the Administrator's noncompliance.  Their health and welfare is profoundly threatened by EPA's failure to take steps mandated by the Act to control ozone pollution in the air they breathe.  As noted above, the Washington area suffers from dangerous levels of ozone pollution, presenting an immediate and substantial public health risk.  The air is so polluted that Sierra Club members limit their outdoor activity and that of their children, and persons with lung ailments are advised to do so as well.  Exhs. 3, 4, 5.  Ozone pollution at these levels increases the risk to Club members and others of asthma attacks, lung damage, and emergency room visits.  Exh. 3.  EPA's failure to take the actions sought herein unlawfully delays measures required by the Act to remedy such dangerous levels of pollution.

Given that ozone pollution repeatedly reaches unhealthful code red levels, and the air is so dirty that children are repeatedly warned to limit outdoor play, the public interest strongly favors enforcement of federal clean air mandates.   Moreover, the Act sets forth public policy on this

matter in clear and explicit terms, by requiring the Administrator to take approval/disapproval actions by specific deadlines, all of which passed long ago.  The purpose of these requirements - to protect human health - is of the highest possible public importance.

In contrast, the Administrator cannot possibly claim any harm from being ordered to take final action on these plans.  EPA's duty to take such action is dictated by the Act itself and the D.C. Circuit's decisions vacating EPA's prior approval actions.  That court specifically held that the ozone plans for the Washington area did not meet all the applicable requirements of the Act – specifically, the requirements for a demonstration of timely attainment, for meeting rate of progress requirements in years after 1999, for adoption of all reasonably available control measures, and for adoption of contingency measures.  294 F.3d at 160-64.  The same court subsequently held that EPA acted illegally in conditionally approving these very same deficient plans.  Pursuant to § 110(k)(3) of the Act, EPA must therefore disapprove these plans.  42 U.S.C. § 7410(k)(3)("If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part").   This is not a matter for further delay, debate or deliberation.

Judicial relief is urgently needed in light of EPA's long history of illegal delay and inaction in this matter.  The Act required the states to submit their serious area attainment and rate of progress plans to EPA by November 15, 1994, and required EPA to approve or disapprove them within 18 months thereafter – i.e., by May 15, 1996.  Contrary to these explicit statutory deadlines, EPA allowed the states to delay submittal of their plans until years later, and did not act on those submittals until January 2001 – nearly *five years* past the timeframe required by Congress and almost two years *after* the date by which the plans were to be fully implemented.  EPA acted at that late date only after being sued by Sierra Club and others in a separate case that sought to compel

promulgation of a federal clean air plan because of the lack of approved state plans. NRDC v. Whitman, No. 99-CV-2976 (CKK) (D.D.C.).[3]  Further, EPA knew full well that its approval of the state plans in January 2001 and its conditional approval of the *very same* plans in April 2003 were of dubious legality.

EPA's own Office of Inspector General recently found that the agency has failed to effectively ensure that ROP plans in nonattainment areas such as Washington are developed and implemented within the time frames required by the Act.  EPA, Office of Inspector General, "EPA and States Not Making Sufficient Progress in Reducing Ozone Precursor Emissions in Some Major Metropolitan Areas, Rept No. 2004-P-00033, Sept. 29, 2004 at 27 (available at: http://www.epa.gov/oig/reports/2004/20040929-2004-P-00033.pdf).  According to the Inspector General, adequate ROP plans and required pollution controls have been delayed because, among other things, EPA has "[a]llowed States extensive periods of time (up to 8 years) to develop acceptable ROP Plans and make changes to draft plans," and because "EPA took excessive time to review and/or approve ROP Plans or ROP changes by States." Id.

EPA cannot and should not be allowed to compound its thwarting of the Act by delaying any further the action that was required by the Act in the first place – namely lawful, final approval/disapproval action on the state's plans.

---

[3] The U.S. District Court for the District of Columbia entered a consent decree in that case that, among other things, required EPA to propose a federal implementation plan for the Washington ozone nonattainment area unless the Administrator signed a notice fully approving state plans for the area by December 15, 2000.  NRDC v. Whitman, No. 99-CV-2976, Consent Decree entered 6-12-00, as amended 11-6-00.  EPA's January 3, 2001, Federal Register notice approving the Washington area ozone plans was signed on December 15, 2000.  66 Fed. Reg. at 631.

**3. The Court should direct EPA to publish final approval/disapproval action within 45 days of the Court's order**

When Congress "categorically mandate[s]" that EPA meet explicit deadlines, EPA is "deprive[d] of all discretion over the timing of its work." Sierra Club v. Thomas, 828 F.2d 783, 791 (D.C. Cir. 1987).  Violations of such statutory deadlines should be corrected at the "earliest possible date," using all available means.  Delaney v. EPA, 898 F.2d 687, 691 (9th Cir. 1990)(citation omitted). The Supreme Court has ruled that Congress intended to strictly limit EPA's discretion in the Clean Air Act's nonattainment provisions.  Whitman v. American Trucking Assns., 531 U.S. 457, 484-85 (2001).

Here, Sierra Club proposes that the Court direct EPA to take final approval/disapproval action on the above-referenced plans within 45 days of the Court's order.  This time frame matches the time allowed in the Court's December 18, 2002 injunction for EPA to take final action on its proposed nonattainment/reclassification determination.  The same schedule is warranted here because EPA has already been told *twice* by the D.C. Circuit in no uncertain terms that these plans are not legally approvable.  There is no need for EPA to go through yet another round of notice and comment rulemaking to reach the conclusion that it cannot approve these plans.  Moreover, when EPA proposed to conditionally approve the plans on February 3, 2003, the agency also proposed in the alternative to disapprove them.  68 Fed. Reg. 5246, 5260-61 (2003). Thus, the agency has already provided an opportunity for public comment on a proposal to disapprove these plans, and does not need to provide another one.  See Sierra Club v. Browner,  130 F. Supp.2d 78,  95-6 (D.D.C. 2001)(where public comment on proposal had already been completed, EPA was ordered to publish final attainment/reclassification determination for St. Louis within 45 days).

As a result of EPA's delays and illegal plan approvals, we are more than a decade past the original plan submittal deadline for the Washington area, but the region *still* does not have an approved plan to attain the ozone standard. EPA delays and inaction have completely eviscerated the precise schedule set out by Congress. Meanwhile, children, asthmatics and others in the Washington area face continued exposure to ozone pollution that will put them at risk of asthma attacks, emergency room visits, lung damage, and other serious health impacts. The time has come to put an end to EPA delays. As this Court noted in issuing its 2002 injunction, EPA's poor track record in complying with deadlines make injunctive relief "not so much an extraordinary as a necessary remedy for Plaintiffs." Exh. 11 at 35.

**CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully ask the Court to enter a preliminary and permanent injunction directing EPA to complete and publish final approval/disapproval action on the above-described ozone SIP submittals for the Washington area within 45 days.[4] A proposed form of order is provided herewith.

DATED: December 15, 2004.

Respectfully submitted,

David S. Baron (D.C. Bar # 464222)
Earthjustice
1625 Massachusetts Ave., NW, Suite 702
Washington, D.C. 20036-2212
(202) 667-4500

Counsel for Plaintiff Sierra Club

---

[4] The specific SIP submittals covered by this request are listed in paragraph 28 of Sierra Club's complaint. These are the same SIP submittals that the Court ordered EPA to act upon in the Court's December 18, 2002 injunction.